IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

RAJENDRA PATEL, NAVNEET PATEL, )
and NAVRAJ GROUP, LLC (a Tennessee )
Limited Liability Company), )
 )  NO. 3:20-cv-00052
   Plaintiffs, )  JUDGE RICHARDSON
 )
v. )
 )
AR GROUP TENNESSEE, LLC (a New )
Jersey Limited Liability Company), et al., )
 )
   Defendants. )

## **MEMORANDUM OPINION**

Pending before the Court is Defendants' Motion to Dismiss Plaintiffs' Second Amended

Complaint. (Doc. No. 69, "Motion"). For the reasons discussed below, the Motion will be granted.

## PROCEDURAL BACKGROUND

The filing of the Second Amended Complaint ("SAC") was prompted (and permitted) by

the Court Order (Doc. No. 63, "Prior Order") that the predecessor First Amended Complaint failed

to meet the pleading requirements of Federal Rule of Civil Procedure 8(a). In describing the

allegations of the First Amended Complaint and how they were flawed,[1] the Court explained in

pertinent part:

> On or about June 5, 2017, Plaintiff Navraj Group, LLC ("Navraj") and
> Defendant AR Group Tennessee, LLC ("ARGT") [allegedly] entered into a
> document called a "Partnership Agreement" (Doc. No. 36-1) for the purpose of
> owning and operating eleven Popeye's restaurant franchises in the Middle

---

[1] The allegations of the SAC are not identical to those in the First Amended Complaint, and so the SAC is not necessarily flawed in any particular way in the which the First Amended Complaint was flawed. Nevertheless, recounting the description in the Prior Order of material allegations in the First Amended Complaint is appropriate here because: (i) some of the flawed allegations in the First Amended Complaint are repeated in the SAC, and it is quite consequential that the flaws in such allegations were not corrected in the SAC; and (ii) this description provides a helpful introduction of the concepts implicated by the SAC and therefore provides context for the discussion below.

Tennessee area. (Doc. Nos. 36 at 3; 36-1 at 1, 5). More specifically, the [alleged] Partnership Agreement provided that Plaintiff Navraj would own 15 percent of ARGT "and their 11 Popeyes in [the] Nashville, TN market." (Doc. No. 36-1 at 1). The so-called Partnership Agreement was signed on behalf of ARGT by some of its members/managers, and on behalf of Navraj by the two individual Plaintiffs herein (Rajendra Patel and Navneet Patel).

As alleged by Plaintiffs and indicated by the Partnership Agreement, ARGT is a limited liability company (LLC), so one would think that Navraj would be a member of that LLC, with a 15 percent ownership interest in the LLC. But alas, that is not what the Amended Complaint alleges. Instead, for whatever reason, it alleges that "the express terms of the Partnership Agreement *create a general partnership* and *the Plaintiffs* own fifteen percent (15%) of the partnership and partnership properties." (Doc. No. 36 at 3) (emphasis added). This is patently incorrect because in fact what the Partnership Agreement expressly provides is that *one* Plaintiff (Navraj) owns 15 percent of an *LLC* (namely, ARGT), which is simply not the same thing as a *general partnership*. And even if the entity at issue were a general partnership rather than an LLC, it [sic] untrue that the (so-called) Partnership Agreement *created* the general partnership; the Partnership Agreement contains no language purporting to *create* any entity and no language bestowing the other 85 percent upon anyone (or indeed saying anything about who owns the other 85 percent). To the contrary, the Partnership Agreement is written as if ARGT already existed and that a 15 percent ownership interest of this existing entity was being bestowed upon Navraj. Accordingly, the Court cannot and does not accept the allegation that "the express terms of the Partnership Agreement create a general partnership and the Plaintiffs own fifteen percent (15%) *of the partnership and partnership properties*." The consequences of this non-acceptance will be explained later herein as appropriate. For present purposes, suffice it to say that with respect to the matter of who on the Plaintiffs' side owned what, the Court accepts as true that (and only that) Navraj owned 15 percent of an entity called ARGT (which based on its very name was at least *supposed* to be an LLC).

The Court does not venture a guess as to what kind of entity ARGT was supposed to be, a question clouded by the title of the Partnership Agreement and the fact that Navraj's signature block in the Partnership Agreement identified it as a "partner." Notwithstanding these incongruous references to a "partner[ship]," it is undeniable that what the Partnership Agreement expressly did in pertinent part was to make Navraj an owner—called a "member" in LLC parlance—of an LLC, namely, ARGT. On the other hand, given Plaintiffs' allegations that ARGT was a "partnership.". . . . It is quite clear that the *express terms* of the Partnership Agreement suggest that it relates not to a partnership at all but rather to an LLC . . .

. . . .

Accordingly, where the Court refers below to Plaintiffs' allegations regarding a "partnership," it is with the understanding that the Court cannot and does not . . . accept as true that there was legally any partnership.
.

(Doc. No. 63 at 3-5) (footnotes omitted). One might have thought that (unless Plaintiffs concluded that the Court's observations somehow were wrong) that in the SAC, Plaintiffs would have retreated from the notion that the referenced agreement (referred to below as "Plaintiffs' proffered Agreement") created a general partnership—or at the very least would have included allegations intended to plausibly explain how it is that the referenced written agreement somewhat created a general partnership. But alas, as explained below, this did not occur.

The Court then explained:

Federal Rule of Civil Procedure 8(a) requires that a pleading contain: "(1) a short and plain statement of the grounds for the court's jurisdiction, unless the court already has jurisdiction and the claim needs no new jurisdictional support; (2) a short and plain statement of the claim showing that the pleader is entitled to relief; and (3) a demand for the relief sought, which may include relief in the alternative or different types of relief." Further, "there is no 'duty (on the part) of the trial court or the appellate court to create a claim which appellant has not spelled out in his pleading.'" *Clark v. Nat'l Travelers Life Ins. Co.*, 518 F.2d 1167, 1169 (6th Cir. 1975), *quoting Case v. State Farm Mutual Automobile Insurance Co.*, 294 F.2d 676, 678 (5th Cir. 1961). Courts may dismiss a complaint sua sponte for noncompliance with Rule 8(a)(2) when "the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised." *Dorisca v. Rawls*, No. 18-CV-9756 (JGK), 2019 WL 2085360, at *2 (S.D.N.Y. May 10, 2019), *quoting Simmons v. Abruzzo*, 49 F.3d 83, 86 (2d Cir. 1995) (quotation marks and citation omitted); *see also Hill v. Blount Cty. Sch.*, No. 3:14-CV-96-PLR-HBG, 2015 WL 13813827, at *4 (E.D. Tenn. Mar. 9, 2015) (Where a complaint fails to comply with Rule 8, the district court has the power, on motion or *sua sponte*, to dismiss the complaint[.]").

As described above, the Court simply cannot parse out a clear set of facts or allegations from the Amended Complaint in order to understand the business relationship between Plaintiffs and Defendants. In other words, the Court simply cannot tell who or what allegedly had what business relationship(s) with whom or what, and what document(s) allegedly governed which such relationships. Plaintiffs have not made a plain statement identifying the nature of the agreement or relationship between the parties (whether it be a partnership, an LLC, some other arrangement, or some combination thereof), and the Court has no duty to draw any inferences or conclusions in an attempt to guess what the arrangement between the

parties may have been. As suggested above, the particular nature of these relationships—far from being a matter of mere formalism—could hold the key to the validity of multiple claims (when viewed after or even at the pleading stage). Moreover, certain allegations of the Complaint appear entirely inconsistent with either other allegations of, or attachments to, the Amended Complaint.

Without a comprehensible statement of these crucial facts, the Court cannot construe the complaint to include "a short and plain statement of the claim showing that the pleader is entitled to relief," as required by Fed. R. Civ. P. Rule 8(a)(2), let alone make any findings pursuant to Rule 12(b)(6) and related case law. Plaintiffs' First Amended Complaint is thus vague and unintelligible enough to warrant *sua sponte* dismissal under Rule 8(a)(2). Thus, the Court will dismiss *sua sponte* Plaintiffs' First Amended Complaint on this basis.

The Court is very hesitant to entirely extinguish Plaintiffs' claims, based on the Court's unavoidable confusion as to key allegations underlying them, when they conceivably could prove ultimately meritorious. This is especially true since the Court is dismissing the Amended Complaint *sua sponte* on this basis, as Defendants for whatever reason did not raise it.

The Amended Complaint thus will be dismissed without prejudice, and Plaintiffs will have the option to file another amended complaint within 21 days of the entry of the Court's corresponding order, failing which this action will be dismissed with prejudice. The Court notes that, as the corresponding order will make claim [sic], any amended complaint may differ from the Amended Complaint only to address the deficiencies (confusion) identified herein, and not to otherwise substantively change the nature of existing claims or add additional claims.

(Doc. No. 63 at 22-25).

<u>ANALYSIS OF PLAINTIFFS' SECOND AMENDED COMPLAINT</u>

One would have thought that, when they subsequently filed the SAC in response to the Court's invitation to do so, Plaintiffs would have been meticulous about addressing the deficiencies and clearing up the confusion identified by the Court. Alas, as discussed below, that proved not to be the case.

On the other hand, to their credit, Plaintiffs appear to have heeded the Court's prohibition against using the SAC to add claims, although they did (as was perfectly appropriate) drop some claims. It is less clear that they complied with the Court's (admittedly somewhat ambiguous)

prohibition against "substantively changing the nature of existing claims"; on balance, though, the Court is satisfied that any changes between the First Amended Complaint and the SAC that could reasonably deemed to "substantively change the nature of [one or more] existing claims" was intended to comply with the Court's admonition to *clarify* the nature of the claims rather than to substantively change such claims. The problem with the SAC lies not in any (non-existent) attempt to add to or impermissibly change the nature of the claims previously pled,[2] but rather with the reality—discussed below in some detail—that the attempt at *clarification* was entirely unsuccessful.

The SAC asserts a total of eight claims against Defendants, who collectively comprise three individuals (Ali Butt, Mourad Elayan, and Dinesh Goswami), one New Jersey limited liability company (AR Group Tennessee, "ART," which the Prior Order had called "ARGT"), and one New Jersey corporation (AR Group of Restaurants, Inc. "ARG").

All parties agree that there is one (and only one) written agreement dated prior to June 7, 2018 that is relevant in this case, that such document bore a date of June 5, 2017, and that such agreement may be thought of as the document that originated a legal relationship between one or more parties who are now a Plaintiff in this case and one or more parties who are now a Defendant in this case. For multiple reasons on which the Court need not now dwell,[3] it is perhaps safest to refer to this written agreement (whatever it was) by nothing more specific than its date, *i.e.*, as the "June 5, 2017 Agreement." As discussed below, there is a distinct lack of clarity and agreement as

---

[2] For their part, Defendants do not contend that Plaintiffs impermissibly sought to substantively change the nature of the claims as pled in the First Amended Complaint; to the contrary, Defendants assert that "Plaintiffs' current Complaint is not discernably different from their prior pleading and continues to have the same uncorrected deficiencies pointed out by this Court." (Doc. No. 70 at 9).

[3] The Court will briefly note that it declines to refer to this written agreement in terms of the title its bears ("Partnership Agreement"), because as discussed below the written agreement actually has nothing to do with any partnership.

to which Plaintiff(s) and which Defendant(s) were parties to the June 5, 2017 Agreement, and this is because there is disagreement between the two sides as to what specific document was in fact the June 5, 2017 Agreement.

So an initial question is what document, if any, the Court should accept, for present purposes, as the actual June 5, 2017 Agreement. Plaintiffs claim that the Court should go with Exhibit 1 to the SAC (Doc. No. 67-1, "Plaintiffs' proffered Agreement"),[4] which: is titled "Partnership Agreement"; states at the very beginning that it "is made on this 5th day of June, 2017, by and between [ART] and [NAVRAJ]"; states at the very end that "ART and NAVRAJ have executed [it]"; and contains the following signature block:



(Doc. No. 67-1 at 1). As can be seen, Plaintiffs' proffered Agreement is missing the signatures of Defendants Butt and Elayan where the signature block contemplates each of them signing as a "member/manager" of ART.

---

[4] This is the same document that Plaintiffs had attached as Exhibit 1 to the First Amended Complaint (Doc. No. 36-1).

Understandably enough, considering the absence of two contemplated signatures on Plaintiffs' proffered Agreement, Defendants assert (in their memorandum in support of the Motion) that Plaintiffs did not "provid[e] the fully executed agreement." (Doc. No. 70 at 10). But Defendants' complaint is not simply that Plaintiffs did not provide a copy of the June 5, 2017 Agreement that contains all signatures. Its real complaint here is that Plaintiffs' proffered Agreement was never entered into by the parties, and that instead the actually executed (*i.e.*, fully signed) June 5, 2017 Agreement was an agreement having terms (and indeed contracting parties) different from those indicated by Plaintiffs' proffered Agreement. According to Defendants, the authentic June 5, 2017 Agreement is the document attached as Exhibit A to its memorandum in support of its Motion (Doc. No. 70-1, "Defendants' proffered Agreement"). This document, like Plaintiffs' proffered Agreement, is titled "Partnership Agreement" and states at the very beginning that it "is made on this 5th day of June, 2017." However, it differs from Plaintiffs' proffered Agreement in that it: states that it is "by and between [ART] and Rajendra Patel and Navneet Patel . . . hereinafter referred to [collectively] as 'RN'"; states at the very end that "ART and RN have executed [it]"; and contains the following signature block:

Witness:

AR GROUP TENNESSEE LLC

_____    ~~Ali Butt~~
                           By: Ali Butt, Member/Manager

_____    ~~Dinesh Goswami~~
                           By: Dinesh Goswami, Member/Manager

_____    ~~Mourad Elayan~~
                           By: Mourad Elayan, Member/Manager

Witness:

OPERATING PARTNER

_____    ~~Rajendra Patel~~
                           By: Rajendra Patel

_____    ~~Navneet Patel~~
                           By: Navneet Patel

Plaintiffs are having none of this. Responding to the Motion, Plaintiffs claim that Defendants' proffered Agreement "has never been previously disclosed in this litigation and is highly suspicious." (Doc. No. 75 at 3). Plaintiffs further claim that they "do not have, nor have they ever had," Defendants' proffered Agreement. (*Id.*). According to Plaintiffs, "[n]ot only is it a document outside the pleadings, which would convert the motion to one for summary judgment, but Defendant's [sic] discovery and assertion of it at this stage is highly suspect." (*Id.* at 4). Therefore, Plaintiffs contend, "this Court cannot consider Exhibit A in any way in ruling upon the Motion to Dismiss." (*Id.*).

The Court agrees with Plaintiffs that at this stage, it needs to accept Plaintiffs' allegation that Plaintiffs' proffered Agreement is the actual June 5, 2017 Agreement. Defendants may dispute that allegation, and for all the Court knows Defendants' position may be the correct one. But for now, the Court does not determine which side (if any) has proffered an authentic version of the June 5, 2017 Agreement, and instead simply accepts *arguendo* Plaintiffs' allegations on this point.

This is because, for purposes of a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court generally must take all of the factual allegations in the complaint as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court is confident that the general rule applies to the (very common) kind of allegation at issue here, *i.e.*, an allegation that an exhibit attached to the complaint is a true and accurate copy of a written contract implicated by the complaint, and it will proceed accordingly.

This sounds like good news for Plaintiffs. But in reality, ultimately it is not. *Creelgroup, Inc. v. NGS Am., Inc.*, 518 F. App'x 343, 346–47 (6th Cir. 2013), is instructive in this regard. In that case, the plaintiff, Creelgroup, asserted a claim for breach of contract against multiple defendants, including NGS. NGS moved to dismiss, and the district court granted the motion to dismiss, in part because it found (at least on motion for reconsideration) that NGS was not a party to the contract at issue. *Id.* at 346. On appeal, the Sixth Circuit agreed, explaining as follows:

> Although Creelgroup rightly asserts that the relevant question is whether it is "plausible on its face that Creelgroup pleaded the existence of a contract with NGS," we must review the contract itself in addition to the pleadings. Creelgroup cannot survive a motion to dismiss, even if it has pleaded the existence of a contract, if the written instrument plainly contradicts the pleadings because "when a written instrument contradicts allegations in the complaint to which it is attached, the exhibit trumps the allegations." *Williams v. CitiMortgage, Inc.,* 498 Fed. Appx. 532, 536 (6th Cir.2012) (quoting *N. Ind. Gun & Outdoor Shows, Inc. v. City of S. Bend,* 163 F.3d 449, 454 (7th Cir.1998)); *see Fayetteville Investors v. Commercial Builders, Inc.,* 936 F.2d 1462, 1465 (4th Cir.1991) ("Indeed, in the event of conflict between the bare allegations of the complaint and any exhibit attached pursuant to Rule 10(c), Fed. R. Civ. P., the exhibit prevails.").
>
> A close reading of the contract reveals that Creelgroup was never a party to the contract. The 2005 First Amendment and the 2008 Second Amendment indicate only that Creelgroup consented to receive a fee of two dollars per employee per month for previously brokering the deal between NGS and Oakwood, and Creelgroup raises no claim that at the time it brokered the deal, it had entered into a fee agreement. The contract as a whole reinforces the conclusion that this was a contract between NGS and Oakwood only. *See Wilkie v. Auto–Owners Ins. Co.,* 469 Mich. 41, 664 N.W.2d 776, 781 n. 11 (2003) ("We read contracts as a whole, giving harmonious effect, if possible, to each word and phrase."). The

Second Amendment's language refers only to two parties. *See* R. 12–3 at 1 ("This Agreement may be discontinued ... [b]y *either party* ... [and] *either party* shall be free to seek to enforce its rights under the Agreement.") (emphasis added). The 2005 Agreement also states: "This Agreement may not be amended without the express written consent of *both parties*." R. 12–1 at 18 (emphasis added). It is clear that Creelgroup was not a party to the contract because the 2005 Agreement requires only Oakwood and NGS's written consent to legally amend its terms. As a non-party to the agreement, Creelgroup cannot state a claim for relief.

Creelgroup alternatively argues that a contract can be implied by the conduct of the parties, relying on this court's decision in *Contship Containerlines v. Howard Industries,* 309 F.3d 910, 912 (6th Cir.2002). That case is inapposite, however, because under Michigan law, an implied contract can exist only if there is no express contract. *Martin v. E. Lansing Sch. Dist.,* 193 Mich. App. 166, 483 N.W.2d 656, 661 (1992). Here, there was an express written contract governing the agreement, even if Creelgroup was not party to that agreement. An implied contract also requires that the parties have a mutual intention to contract. *Erickson v. Goodell Oil Co.,* 384 Mich. 207, 180 N.W.2d 798, 800 (1970). Creelgroup has not pleaded sufficient facts to show that NGS had any intention to form a contract with Creelgroup. Creelgroup cannot survive the motion to dismiss on an implied-contract theory.

*Id.* at 346–47. *Creelgroup* is persuasive authority for three propositions that are squarely applicable to the instant case even though it does not involve a breach-of-contract claim as did *Creelgroup*. The first is that, as stated verbatim in *Creelgroup*, when a written instrument contradicts allegations in the complaint to which it is attached, the exhibit trumps the allegations. The second, applicable when the written instrument at issue is a contract, is that the attached exhibit trumps the allegations of the complaint not only as to what the terms are of the written contract, but also as to who the parties are to the written contract. And the third is that where (as under Tennessee law as with Michigan law)[5] an implied contract cannot be implied where an express contract exists, a plaintiff cannot "fix" its complaint's inaccurate designation of the parties to an express contract by

---

[5] "A contract cannot be implied . . . where a valid [express] contract exists on the same subject matter." *Jaffe v. Bolton*, 817 S.W.2d 19, 26 (Tenn. Ct. App. 1991). *Accord Daily v. Gusto Recs., Inc.*, 14 F. App'x 579, 587 (6th Cir. 2001) (citing *Jaffe*). As *Daily* makes clear, this means (among other things) that a plaintiff cannot successfully claim the existence of an implied contract against non-parties to an express contract governing the same substance, unless the express contract becomes invalid or unenforceable—which is not a fate that Plaintiffs assert for the June 5, 2017 Agreement.

the simple expedient of claiming that there was an implied contract between the parties the plaintiff

now claims were parties to an (implied) contract.

As applied in this case, these principles dictate that the Court take as true what is plainly

indicated by the attachment to the SAC—Plaintiffs' proffered Agreement—even if the plain

substance of the attachment conflicts with the allegations in the SAC.[6] They also dictate that if the

attached written contract is clear as to who the parties are to the contract, the court needs to accept

that these are the parties to the written contract and should not entertain any assertion that (with

respect to the subject matter of the written contract) there was an implied contract between parties

other than those who plainly were the parties to the written contract.

Consistent with the discussion above from *Creelgroup*, "if a factual assertion in the

pleadings is inconsistent with a document attached for support, the Court is to accept the facts as

---

[6] This raises the question of whether Plaintiffs' proffered Agreement, because it omits contemplated signatures and thus appears not to be "fully executed," conflicts with the allegation in the SAC. The argument could be made that the Court must disregard that allegation from the SAC and instead treat Plaintiffs' proffered Agreement (based on its appearance) as never having been executed at all. But this approach would be inconsistent with the Sixth Circuit's view expressed in *Courie v. Alcoa Wheel & Forged Prod.*, 577 F.3d 625 (6th Cir. 2009). In *Courie*, the lead plaintiff was a Caucasian employee who sued his employer (among others), alleging that it discriminated against him by settling his union grievance via an agreement that branded him a racist. The district court dismissed the claims, and the Sixth Circuit affirmed. Regarding the alleged agreement (which the plaintiffs apparently attached to the complaint), the Sixth Circuit explained:

> The Couries' legal arguments rest wholly upon the existence of a "settlement agreement" that possibly does not exist: all we have is an unsigned proposal from the UAW to Alcoa. Yet a complaint need only "contain sufficient factual matter" to be "plausible," *Iqbal*, 129 S. Ct. at 1949, and we cannot dismiss for factual implausibility "even if it [would] strike[ ] a savvy judge that ... recovery is very remote and unlikely," *Twombly*, 550 U.S. at 556, 127 S. Ct. 1955 (internal quotation marks and citation omitted); see also *Iqbal*, 129 S. Ct. at 1950 ("Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."). Here, Courie has alleged that this settlement agreement exists and has provided an unsigned settlement proposal as an exhibit to his complaint in support. For purposes of his motion to dismiss, that is "sufficient" detail for us to assume that the agreement existed.

*Id.* at 630. (As an aside, the Court notes that *Iqbal* and *Twombly* actually use the term sufficient "factual matter" rather than sufficient "detail," the term used in *Courie*). From *Courier* the Court concludes that a plaintiff, by attaching an unsigned (or not fully signed) version of an alleged written agreement, does not contradict of an allegation that the alleged written agreement was in fact consummated.

stated in the attached document." *Nat'l Ass'n. of Minority Contractors, Dayton Chapter v. Martinez*, 248 F. Supp. 2d 679, 681 (S.D. Ohio 2002), quoted in *Williams*, 498 F. App'x at 536. And "when a written instrument contradicts allegations in the complaint to which it is attached, the exhibit trumps the allegations." *N. Ind. Gun & Outdoor Shows, Inc. v. City of S. Bend,* 163 F.3d 449, 454 (7th Cir. 1998), quoted in *Williams*, 498 F. App'x at 536. Moreover, "a court need not feel constrained to accept as truth conflicting pleadings that make no sense, or that would render a claim incoherent, or that are contradicted either by statements in the complaint itself or by documents upon which its pleadings rely, or by facts of which the court may take judicial notice." *In re Livent, Inc. Noteholders Secs. Litig.*, 151 F. Supp. 371, 405–06 (S.D.N.Y. 2001) quoted in *Williams*, 498 F. App'x at 536.

Plaintiffs' proffered Agreement is entirely clear on many key points. First, it is an agreement between ART (a limited liability company) and NAVRAJ. Second, under the agreement, NAVRAJ is to become a 15 percent owner in the limited liability company. Third, although it is titled "Partnership Agreement," the body of it does not implicate the notion of something actually comprising a partnership under the law (be it general or limited), even though it happens to include the word "partner" or "partnership" in five places.[7]

---

[7] First, Plaintiffs' proffered Agreement raises (in paragraph 3) the possibility of what it calls ART "buy[ing] out NAVRAJ from the partnership," (Doc. No. 67-1 at 2-3), but the content of the document indisputably does not serve to create (or reflect in any way) any legal partnership from NAVRAJ that could possibly be bought out; instead, NAVRAJ's interest created by and reflected in the document is *solely* an interest in an LLC (ART). Second, paragraph 10 of Plaintiffs' proffered Agreement is captioned "Partnership Interest," but paragraph 10 refers to the ownership interest as the aforementioned 15 percent interest in ART, *i.e.*, an interest in *a LLC* rather than a partnership. Third, paragraph 11 refers to NAVRAJ's prerogative to "increase [its] partnership share up to 25%," (*id.* at 4), but the share to be increased plainly is a share in *an LLC* (ART), not a partnership. Fourth, paragraph 6 prohibits the disclosure of "confidential information of [ARG], [ART] and/or any partner or member," (*id.*at 3), but as already noted the document indisputably does not serve to create (or reflect in any way) anything at all cognizable as a legal partnership comprised of "partners." And finally, the recitals in Plaintiffs' proffered Agreement refer to the contracting parties "desir[ing] to enter into a Partnership to work with ART," (*id.* at 1), but indisputably nothing in the contractual terms serves to create (or reflect in any way) any legal partnership; in particular, rather than providing for a "[p]artnership to work with ART," Plaintiffs' proffered Agreement provides for the parties merely to *jointly own* ART.

The SAC is premised on allegations characterizing Plaintiffs' proffered Agreement in a manner that is flatly inconsistent with these three incontrovertible points—and in a manner that rather puzzlingly ignores the very clear concerns previously expressed by the Court (in its Prior Order) that Plaintiffs' proffered Agreement does not create a partnership and cannot be treated as having done such a thing. At the very outset of its "Statement of [alleged] Facts," specifically referring to Plaintiffs' proffered Agreement, the SAC alleges that "the individual Plaintiffs and individual Defendants entered into a Partnership Agreement . . . ." (Doc. No. 67 at ¶ 10). This is incorrect because, as noted, Plaintiffs' proffered Agreement undeniably is between ART and NAVRAJ, not the individual Plaintiffs (Rajendra Patel and Navneet Patel) and the individual Defendants (Ali Butt, Mourad Elayan, and Dinesh Goswami).

Soon thereafter, the SAC alleges that "the express terms of the Partnership Agreement create a general partnership between the Plaintiffs and Defendants . . . ." (*Id.* at ¶ 14). This allegation is both incorrect and confusing. It is incorrect because (as noted above) despite its title, Plaintiffs' proffered Agreement does not create any partnership. And the allegation makes no sense even if one were to assume *arguendo* that the document *did* create a general partnership. The allegation is that the partnership is between "Plaintiffs and Defendants"; this suggests that the alleged partnership was between *all* Plaintiffs and *all* Defendants (most of which were individuals), but it stretches credulity to believe that anyone would have wanted the partnership to be comprised of the two LLCs (ART and NAVRAJ) as well as the five individual parties. One

---

Plaintiffs' proffered Agreement bears all of the indicia of having been prepared without substantive assistance of counsel qualified to assist in drafting this kind of document. And as the undersigned recently noted, "laypersons . . . indisputably often throw around terms like 'partner' without having a particular precise legal meaning in mind. The Court sees no reason to believe that they had in mind the particular legal notion of general partners." *Masters Ent. Grp., Inc. v. Aurich*, No. 3:18-CV-01314, 2022 WL 2137090, at *8 (M.D. Tenn. June 14, 2022). But whether or not Plaintiffs' proffered Agreement was prepared with some assistance from counsel, its use of the term "partner" and "partnership" reflects not a reference to anything that truly would be a legal partnership, but rather the same legal imprecision and non-technical connotation that one might expect from laypersons.

suspects that Plaintiffs intended to allege that only the individual parties were partners in the alleged partnership, but they confused the matter hopelessly by not so stating. And in any event, there is absolutely nothing in Plaintiffs' proffered Agreement—beyond the mere use of the terms "partner[s]" and "partnership"—that remotely suggests the possibility that any of the individual Plaintiffs or individual Defendants were to be partners in a partnership, especially since none of them was even a party to the agreement whereby they supposedly became partners in a partnership.

Then, specifically citing Plaintiffs' proffered Agreement, Plaintiffs allege that "the terms of the Partnership Agreement provided that the Defendants were to finance the operation, while the Plaintiffs were required to 'run the operation of ART at 55% food and Labor cost for the year [and that] [a]nything above 55% shall come from the Profit share of NAVRAJ.'" (*Id.* at ¶ 15). But Plaintiffs' proffered Agreement does not say anything at all about who (if anyone) was to "finance the operation" (or do anything along the lines of what might be thought of as "financing the operation"); still less does it say that *Defendants*[8] (as contrasted with a single Defendant, ART) were to finance the operation. Likewise, Plaintiffs' proffered Agreement does not say that *Plaintiffs*[9] (as contrasted with a single Plaintiff, NAVRAJ) were required to "run the operation of ART at 55% food and Labor cost for the year." (*Id.* at ¶ 15).

Next, injecting additional confusion into the mix, the SAC inexplicably lumps the alleged partnership together with ART. Specifically, it alleges that "[t]he partnership and ART currently maintain twelve (12) Popeyes Louisiana Kitchen franchises in Middle Tennessee . . . ." (*Id*. at ¶16). But one cannot possibly tell whether: (i) the SAC means to say that the partnership maintains

---

[8] Considering the use of the plural, the reference here is necessarily to *all*—or, at the very least, multiple—Defendants, including at least one individual Defendant.

[9] Considering the use of the plural, the reference here is necessarily to *all*—or, at the very least, multiple—Plaintiffs, including at least one individual Plaintiff.

(whatever that means) some of the 12 franchises and that ART maintains the others; (ii) the SAC means to say that the partnership and ART jointly maintain each of the 12 franchises; or (iii) the SAC has conflated the alleged partnership and ART, which obviously are two separate things. The SAC also alleges that that "Plaintiffs made an initial contribution of $250,000 in the partnership and into ART." (*Id.* at ¶ 18). But one cannot possibly tell whether: (i) the SAC means to say that Plaintiffs' initial contribution was put partly into the alleged partnership and partly into ART; (ii) the SAC means to say that Plaintiffs' initial contribution in its entirety was for the joint benefit of the alleged partnership and ART, *i.e.*, a single pool of funds to which the alleged partnership and ART somehow had joint rights; or (iii) the SAC has conflated the alleged partnership and ART, which obviously are two separate things.

In multiple other places, the SAC refers not just to the alleged partnership alone, but rather to the "[alleged] partnership" and ART (or ownership in ART) together. (Doc. No. 67 at 3, 6, 7). But nowhere does the SAC indicate why references are being made to ART as well as to the alleged partnership in these contexts, considering that the SAC alleges that under Plaintiffs' proffered Agreement, Plaintiffs became *partners* with ART (and others), as distinguished from *owners of* ART. True, citing Doc. No. 67-1, the SAC does allege that the "individual Plaintiffs"[10] became (joint) owners of a 15 interest in ART. (Doc. No. 67 at 3). But it gives no indication of how this ownership interest relates (if at all) to the ownership interests Plaintiffs would have in the alleged partnership by virtue of (allegedly) becoming partners under Plaintiffs' proffered Agreement. Worse, Plaintiffs' proffered Agreement refers not to the *individual Plaintiffs* having a (joint) 15 percent interest in ART, but rather to *NAVRAJ* having a 15 percent interest in ART. Perhaps this

---

[10] Here, the SAC refers specifically to the "individual Plaintiffs," thus suggesting that where it makes reference to "Plaintiffs" without qualification, the reference is to *all* Plaintiffs. This is very problematic for Plaintiffs, because the SAC in many places is especially non-sensical to the extent that its references to "Plaintiffs" are references to *all* Plaintiffs.

could have been explained. Conceivably (though not necessarily likely) the SAC means to convey that on Plaintiffs' side, there were two separate 15 percent interests in ART—one held jointly by the individual Plaintiffs and one by NAVRAJ. Alternatively, conceivably the SAC meant to convey that the 15 percent interest, though originally intended to be held by NAVRAJ (as plainly indicated in Plaintiffs' proffered Agreement), somehow properly ended up (by amendment to Plaintiffs' proffered Agreement or otherwise) to have been held by the individual Plaintiffs. But the SAC conveys neither of these explanations, or any other explanations, to clarify the nature of the 15 percent ownership interest(s) in ART or how they relate to the partnership supposedly created by Plaintiffs' proffered Agreement.

      The Court could continue in pointing out that (and how) the SAC utterly failed "to address the deficiencies (confusion)," (Doc. No. 63 at 25), in the First Amended Complaint regarding the alleged primary written agreement and legal relationships that underlie all of Plaintiffs' claims. (*Id.* at 22-25).[11] But the above discussion more than suffices to demonstrate that the SAC did not clarify these matters at all, but instead plainly mischaracterized that agreement (Plaintiffs' proffered Agreement), very implausibly suggested the existence of a partnership relationship, and confusingly intermingled the notion of Plaintiffs being partners in some partnership with the notion of Plaintiffs being members of an LLC (ART). The result is that the SAC from the outset simply makes no sense. And the SAC's key allegations that Plaintiffs' proffered Agreement was entered into by the individual Plaintiffs and the individual Defendants, that the partnership was created by virtue of Plaintiffs' proffered Agreement, and that the *Defendants* (plural) were to "finance the

---

[11] Here, the Court is referring specifically to deficiencies in explaining, and confusion regarding, "who or what allegedly had what business relationship(s) with whom or what, and what document(s) allegedly governed which such relationships [and regarding] the nature of the agreement or relationship between the parties (whether it be a partnership, an LLC, some other arrangement, or some combination thereof), " which would require the Court to "guess what [according to Plaintiffs, at least] the arrangement between the parties may have been." (Doc. No. 63 at 23).

operation" (whatever "the operation" means ) must simply be discarded by the Court here because they are entirely contradicted by a plain reading of Plaintiffs' proffered Agreement.

Rather than belaboring that point, the Court instead will proceed to address the consequences of this failure. The Court will say about the SAC what the Court said previously (as quoted above) about the Amended Complaint:

> As described above, the Court simply cannot parse out a clear set of facts or allegations from the [SAC] in order to understand the business relationship between Plaintiffs and Defendants. In other words, the Court simply cannot tell who or what allegedly had what business relationship(s) with whom or what, and what document(s) allegedly governed which such relationships. Plaintiffs have not made a plain statement identifying the nature of the agreement or relationship between the parties (whether it be a partnership, an LLC, some other arrangement, or some combination thereof), and the Court has no duty to draw any inferences or conclusions in an attempt to guess what the arrangement between the parties may have been. As suggested above, the particular nature of these relationships—far from being a matter of mere formalism—could hold the key to the validity of multiple claims (when viewed after or even at the pleading stage). Moreover, certain allegations of the Complaint appear entirely inconsistent with either other allegations of, or attachments to, the [SAC].

> Without a comprehensible statement of these crucial facts, the Court cannot construe the complaint to include "a short and plain statement of the claim showing that the pleader is entitled to relief," as required by Fed. R. Civ. P. Rule 8(a)(2), let alone make any findings pursuant to Rule 12(b)(6) and related case law. Plaintiffs' [SAC] is thus vague and unintelligible enough to warrant . . . dismissal under Rule 8(a)(2). Thus, the Court will dismiss [the SAC] on this basis.

(Doc. No. 63 at 23-24). The Court will go further here in making its above-referenced significant point that the arrangement between the parties "could hold the key to the validity of multiple claims," and state that such arrangement appears likely to hold the key to *all* of Plaintiffs' claims. This is fairly evident when one simply the reads the various claims. Every claim incorporates by reference all of the flawed allegations discussed above, thus clearly relying on those allegations (likely in an attempt to ensure that the claim is supported by sufficient factual matter to satisfy

*Iqbal* and *Twombly*).[12] And most claims refer (sometimes repeatedly) additionally to the alleged "partnership", the "[alleged] partnership and ART," and/or Plaintiffs' proffered Agreement; specifically, Count 1 and Count 2 each refer to the "[alleged] partnership and ART" and Plaintiffs' proffered Agreement, Count 3 refers to the "[alleged] partnership" and separately to the "[alleged] partnership and ART," Count 4 refers to Plaintiffs as "partners," and Count 6 refers to Plaintiffs' proffered Agreement. But Plaintiffs' incorporated and claim-specific references to all of these concepts must be disregarded because, as discussed above, the SAC's articulation of these concepts flatly contradicts the plain terms of Plaintiffs' proffered Agreement, fosters considerable confusion, or does both of these things.

As for the other Counts, they each suffer from incorporating by reference (and thereby relying on) the flawed allegations that preceded them. Count 5, for example, separately sows additional confusion. Count 5, out of nowhere, alleges (as is necessary to support the pled claim of retaliatory discharge) that "Plaintiffs . . . . were employees of ARG and ART." (Doc. No. 67 at 15). Even setting aside the fact that Plaintiff surely should have referred here (as they did elsewhere) to the *individual* Plaintiffs, this allegation makes no sense in light of everything that has come before it (which paints Plaintiffs as partners in some partnership and at times, confusingly, as members of ART); this conclusory allegation of employee status, simply makes no sense when viewed in the context of the SAC. The SAC is woefully unclear, but one thing it does indicate throughout is that the individual Plaintiffs were not *mere* employees, and to the extent that Plaintiffs in Count 5 wish to claim that they were employees *in addition to* being owners, the claim is implausible and not supported by any factual matter. Fostering even greater confusion is

---

[12] The problem here for Plaintiffs is not so much an insufficient *amount* of factual matter as it is insufficient *comprehensibility* of the factual matter that was provided.

the allegation that they somehow were employees (apparently simultaneously) of not just one LLC, but two.

As for Count 7 and Count 8, they are so-called "RICO claims," claims under the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.* "RICO provides a private cause of action for '[a]ny person injured in his business or property by reason of a violation of Section 1962 of this chapter.' Section 1962, in turn, contains RICO's criminal provisions." *Hemi Group, LLC v. City of New York*, 559 U.S. 1, 130 S. Ct. 983, 987 (2010) quoting 18 U.S.C. § 1964(c)). More specifically, Section 1962 contains four different criminal provisions, each in a separate subsection. In 18 U.S.C. § 1962(a), 18 U.S.C. § 1962(b), and 18 U.S.C. § 1962(c), RICO declares unlawful the conduct described in each of these three respective subsections. And in 18 U.S.C. § 1962(d), RICO declares it unlawful to conspire to commit a substantive RICO violation.

RICO is primarily a criminal statute, investigated and prosecuted by components of the United States Department of Justice. But as indicated above, it also provides a civil remedy for private parties injured by a violation of Section 1962, *i.e.*, either a "substantive" RICO violation or a RICO conspiracy. In this case, Plaintiff alleges only one kind of substantive RICO violation, *i.e.* a violation of Section 1962(c),[13] which is the basis for Count 7. (Doc. No. 67 at 97, 102, 117). Plaintiff also alleges a RICO conspiracy in violation of 18 U.S.C. § 1962(d).

---

[13] As the Supreme Court has explained:

> Section 1962(c) makes it unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." The term "enterprise" is defined as including "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." § 1961(4).

Count 7 and Count 8 each depend upon *comprehensible* allegations regarding the relationship between Plaintiffs and Defendants. The reason is straightforward even if not necessarily intuitive.[14] As indicated above, a plaintiff does not have a valid civil RICO claim unless he was "injured in his business or property by reason of a violation of Section 1962 of this chapter." 18 U. S. C. § 1964(c). So a plaintiff needs to show that (and how) the defendant's RICO violations injured him in his business or property. In other words, he needs to show why those violations injured him *in particular*, as opposed to injuring only other persons or society in general. The substantive RICO violation alleged in Count 7 is based on all kinds of nefarious activities (allegedly amounting to racketeering activity) undertaken in conducting the affairs of an alleged enterprise[15] consisting of ART, ARG, and each of the three individual Defendants. (Doc. No. 67

---

*United States v. Turkette*, 452 U.S. 576, 580 (1981). "To state a RICO claim [based on a violation of Section 1962(c)], a plaintiff must plead the following elements: '(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.'" *Ouwinga v. Benistar 419 Plan Servs., Inc.,* 694 F.3d 783, 791 (6th Cir. 2012) (quoting *Moon v. Harrison Piping Supply,* 465 F.3d 719, 723 (6th Cir. 2006)).

[14] By definition, a conspiracy is an agreement, and a RICO conspiracy is an agreement to commit a substantive RICO violation. That raises the question of what it means to be "injured" via RICO conspiracy; in particular, is it sufficient (or perhaps even required) for a plaintiff to show that it has suffered an injury from the *agreement* itself? The answer is no; it is irrelevant whether the plaintiff can be said to have been injured by the agreement. The Supreme Court has made clear that to be "injured" by a RICO conspiracy is to be injured by an act in furtherance of the conspiracy that is an act of racketeering or otherwise unlawful under RICO. *See Beck v. Prupis*, 529 U.S. 494, 507 (2000). Notably, a cognizable RICO injury is *not* an injury that somehow results from the agreement (conspiracy) itself.

[15] As noted in *Turkette*, an "enterprise" for purposes of RICO ("RICO enterprise") is "any individual, partnership, corporation, association, or other legal entity and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). Here, Plaintiff primarily alleges an enterprise in the form of an "association," known as an "association-in-fact" enterprise. The Sixth Circuit's 2012 discussion of this kind of enterprise is still valid today:

> The Supreme Court recently clarified what is required to show an association-in-fact enterprise in *Boyle v. United States,* 556 U.S. 938, 129 S. Ct. 2237, 173 L.Ed.2d 1265 (2009). The Court stated that "an association-in-fact enterprise must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Id.* at 946, 129 S. Ct. 2237. An association-in-fact enterprise "require[s] a certain amount of organizational structure which eliminates simple conspiracies from the Act's reach." *VanDenBroeck v. CommonPoint Mortg. Co.,* 210 F.3d 696, 699 (6th Cir.2000), *abrogated on other grounds by Bridge v. Phoenix Bond & Indem. Co.,* 553 U.S. 639, 128 S. Ct. 2131, 170 L.Ed.2d 1012 (2008). The Supreme Court clarified that this organizational structure need not be hierarchical, can make decisions on an ad hoc basis, and does not require the

at 17). And the RICO conspiracy alleged in Count 8 is a conspiracy to conduct the affairs of that alleged enterprise through a pattern of racketeering activity. To plausibly allege that they were injured by reason of these RICO violations, Plaintiffs must set forth factual matter explaining why these RICO violations injured them in particular—why the acts of Defendants allegedly in violation of RICO impacted them, to the point where they sustained an injury in their business or property.

But to explain that, Plaintiffs must adequately explain the relationship between themselves and the persons and entities implicated by the acts allegedly in violation of RICO. Otherwise, Defendants' alleged acts, unlawful though they may be, simply do not support a cause of action for Plaintiffs in particular. And so, to provide just one example, when Plaintiffs allege that Defendants committed racketeering acts by employing and harboring illegal aliens in violation of 18 U.S.C. § 1581 *et seq*., (Doc. No. 67 at 20), Plaintiffs need to plausibly allege—make clear why—that conduct injured Plaintiffs in particular. In the present context, given the content of the SAC, the explanation plainly would have to revolve around the *relationship* between Plaintiffs and Defendants; under the fundamental theory of the SAC (muddled though it is), without those relationships, it would not make any difference to Plaintiffs' business or property that Defendants were (allegedly) engaging in the employment and harboring of illegal aliens. But as noted repeatedly above, the SAC is strikingly unclear as the nature of those relationships, and indeed most of the SAC's core allegations about those relationships simply need to be entirely disregarded

---

members to have fixed roles. *Boyle,* 556 U.S. at 948, 129 S. Ct. 2237. Put another way, a plaintiff must show "simply a continuing unit that functions with a common purpose." *Id.; see also id.* at 949, 129 S. Ct. 2237 (emphasizing "the breadth of the 'enterprise' concept").

*Ouwinga*, 694 F.3d at 794. The undersigned perceives multiple issues as to whether Plaintiffs have plausibly (as opposed to conclusorily) alleged an association-in-fact enterprise support by factual matter, not to mention various issues as to whether Plaintiffs have plausibly alleged other elements of a civil RICO claim, but he need not reach those issues.

because they are in irreconcilable conflict with a document attached to the SAC, *i.e.*, Plaintiffs' proffered Agreement.

In short, fundamental allegations of the SAC regarding the key agreement and key relationships must be disregarded due to their conflict with Plaintiffs' proffered Agreement. With these allegations being disregarded (and even without them being disregarded), the SAC is too confusing to comport with Rule 8(a)'s requirement that it contain a short and *plain* statement of Plaintiffs' claims. For instance, with or without these allegations being disregarded, the SAC creates major confusion regarding what entity or entities Plaintiffs supposedly invested in (a partnership, ART, or both). *See Andreo v. Friedlander, Gaines, Cohen, Rosenthal & Rosenberg*, No. CIV. H-85-551(MJB), 1986 WL 15663, at *4 (D. Conn. Apr. 28, 1986) (stating, in a case where the plaintiffs bought interests in one or more of three limited partnerships based on the defendants' alleged fraud in the sale of the partnership interests, "Plaintiffs' failure to distinguish among the three partnerships in their allegations and claims is a major defect that pervades the complaint. This defect also hinders an accurate assessment of the validity of the claims as pleaded.") (citations omitted). The SAC likewise fosters major confusion as to the role of the partnership vis-a-vis the role of ART, and as to whether the individual Plaintiffs were employees (as opposed to owners) and, if so, in what entity or entities. And as one final example, the SAC fosters major confusion as to the identity of the parties to Plaintiffs' proffered Agreement. "The Court will not subject . . . defendants, or the judicial system itself, to the considerable difficulties embodied in the [SAC]." *Phan v. Accredited Home Lenders Holding Co.*, No. 3:09-CV-328-J-32HTS, 2009 WL 10670339, at *2 (M.D. Fla. Oct. 16, 2009).

Other key allegations cannot be accepted as true, because they simply make no sense either inherently or given how they are presented (namely, without some sort of context that conceivably

could help them make sense). With these allegations not being accepted as true, and with the above-referenced fundamental allegations being discarded entirely, the Complaint is alternatively subject to dismissal for failure to state a claim, *i.e.,* failure to set forth *properly-accepted* factual matter sufficient to make even a single claim rise to the level of plausibility as required by *Iqbal* and *Twombly*.

CONCLUSION

Especially given the warning they received from the Court when it authorized Plaintiffs' to file another amended complaint after the First Amended Complaint was dismissed, Plaintiffs needed to take care that the allegations in the SAC comported with the attachments (especially Plaintiffs' proffered Agreement) and otherwise made sense. Inexplicably, they failed to do so. Accordingly, the Court is left with crucial allegations that it must simply disregard, and with a complaint that (with or without those allegations disregarded) simply makes no sense. Thus, the SAC is subject to dismissal for failure to comply with Rule 8(a) and alternatively for failure to state a claim upon which relief can be granted.[16]

The Sixth Circuit has stated (albeit not necessarily with the utmost consistency)[17] that "where a more carefully drafted complaint might state a claim, a plaintiff must be given at least

---

[16] The SAC suffers from other deficiencies that likely would have independently justified dismissal for failure to state a claim. For example, the SAC lumps together all Defendants without making any distinction between any of them and without making allegations specifying which Defendant allegedly did what. That is, it fails to "distinguish among those whom [Plaintiff] sue[s], [or to] enlighten each defendant as to that person's particular part in the alleged fraud." *Fener v. Belo Corp.*, 425 F. Supp. 2d 788, 811 (N.D. Tex. 2006). A complaint must contain factual matter sufficient to identify which allegations pertain to which defendant (rather than lumping all defendants together without identifying the individual defendant or specifying the combination of defendants to which a particular claim or allegation relates), and the SAC completely fails to do this. Although the Court need not so decide, this alone likely renders the SAC subject to dismissal for failure to state a claim. *See, e.g., See Davis v. Staramba Corp.*, No. 8:15-CV-1936-T-36MAP, 2015 WL 12838807, at *2 (M.D. Fla. Nov. 6, 2015) (dismissing complaint because it "contain[ed] a number of allegations that refer[red] to 'Defendant' or 'Defendants' without identifying the individual defendant or specifying the combination of defendants to which the allegation pertain[ed].").

[17] The Sixth Circuit has not always been crystal clear regarding the extent to which the quoted proposition is more or less absolute rather than subject to exceptions. *See United States ex rel. Roycroft v. Geo Grp., Inc.*, 722 F. App'x 404,

one chance to amend the complaint before the district court dismisses the action with prejudice."

*EEOC v. Ohio Edison Co.,* 7 F.3d 541, 546 (6th Cir. 1993) (quoting *Bank v. Pitt,* 928 F.2d 1108, 1112 (11th Cir. 1991)). Plaintiffs already have had one opportunity to correct the identified deficiencies with clear instructions from the Court to do so, and have been able to file two amended complaints total. So even if they were necessarily entitled to at least one chance to file a more careful (and comprehensible) complaint, Plaintiffs have already had that chance. Moreover, the Sixth Circuit has noted:

> While a district court "should freely give leave [to amend] when justice requires," Fed. R. Civ. P. 15(a)(2), the district court must have before it the substance of the proposed amendment to determine whether "justice so requires." *Beydoun v. Sessions*, 871 F.3d 459, 469 (6th Cir. 2017). In applying this rule, we have held that a district court does not abuse its discretion where, as here, the plaintiff never sought leave to amend. *Islamic Ctr. of Nashville v. Tennessee*, 872 F.3d 377, 387 (6th Cir. 2017); *Sinay v. Lamson & Sessions Co.*, 948 F.2d 1037, 1041 (6th Cir. 1991). And we have applied this holding in affirming a district court's failure to sua sponte grant leave to amend a complaint that, like here, was dismissed for failure to comply with Rule 9(b).

*United States ex rel. Roycroft v. Geo Grp., Inc.*, 722 F. App'x 404, 408 (6th Cir. 2018). These observations naturally apply with equal force to a dismissal for failure to comply with Rule 8(a). And here, Plaintiff never asked for leave to amend the SAC, either outright or conditioned upon the Motion being granted. Thus, for this reason also, the Court has the discretion to dismiss the SAC with prejudice. And the Court exercises such discretion, especially given Plaintiffs clear disregard of the Court's notification both of what to fix and the imperative to fix it.

---

408–09 (6th Cir. 2018). As indicated above, though, the Court concludes that it does not apply when the plaintiff has not asked for leave to amend. And, as noted, even if it does apply in the instant case, it does not help Plaintiffs.

An appropriate order will be entered.

_Eli Richardson_
ELI RICHARDSON
UNITED STATES DISTRICT JUDGE